# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| APRIL LINDSEY-EVANS, BRENNA SEBEK, AND KEVIN SHEEHAN, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>  v.<br><br>NRRM, LLC d/b/a CARSHIELD, LLC, AMERICAN AUTO SHIELD, LLC, and DOES 1-100,<br><br>      Defendants. | Case No.:<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs April Lindsey-Evans, Brenna Sebek, and Kevin Sheehan, individually and on behalf of all others similarly situated, by and through their counsel, bring this action against NRRM, LLC d/b/a CarShield, LLC, American Auto Shield, LLC, and DOEs 1-100 (collectively, "Defendants"). Plaintiffs' allegations herein are based upon personal knowledge and belief as to their own acts, upon the investigation of counsel, and upon information and belief as to all other matters.

## INTRODUCTION

1.    Plaintiffs bring this action on behalf of themselves and on behalf of a class of similarly situated consumers who purchased Vehicle Service Contracts from CarShield and

administered by American Auto Shield, LLC, United Service Protection, and various other DOE Defendants owned and/or operated by American Auto Shield, LLC.[1]

2.    Defendant American Auto Shield, LLC develops and administers Vehicle Service Contracts,[2] which are automobile service agreements in which "[t]he contract seller agrees to perform (or pay for) certain repairs or services outlined in the contract."[3] Likewise, United Service Protection developed and administered Vehicle Service Contracts. Additionally, upon information and belief, American Auto Shield, LLC operates numerous other companies that administer identical Vehicle Service Contracts (hereafter, "DOEs 1-100" or the "DOE Defendants"). Upon information and belief, United Service Protection, In a/k/a United Service Protection Corporation and the DOE Defendants merged with American Auto Shield, LLC, and American Auto Shield, LLC acquired United and the DOE Defendants' assets and liabilities, therefore United and the DOE Defendants no longer exist as separate corporate entities.

3.    A Vehicle Service Contract is purchased separately from the sale of a vehicle and a vehicle manufacturer's warranty. It is designed to provide additional warranty coverage beyond the terms of vehicle manufacturer's warranty.

4.    These Vehicle Service Contracts are sold by Defendant NRRM, LLC d/b/a CarShield, LLC, which "markets vehicle service contracts administered by American Auto Shield," United Service Protection, In and the DOE Defendants.[4]

---

[1] "Unitted Service Protection, In." is a listed administrator in Plaintiff Lindsey-Evans' Vehicle Service Contract. Any typographical errors, to the extent they exist, are attributable to Defendants. Plaintiffs will refer to "Unitted" as "United" throughout this Complaint.
[2] Exemplar copies of the current Vehicle Service Contracts can be found at https://carshield.com/protection-plans/sample-contracts/ (last visited March 21, 2025).
[3] https://consumer.ftc.gov/articles/auto-warranties-and-auto-service-contracts#AutoServiceContractsFacts (last visited March 21, 2025)
[4] https://carshield.com (last visited March 21, 2025)

5.      Together, Defendants tout themselves as America's "#1 Auto Protection Company."[5] Defendants promise to offer customers "the single most comprehensive vehicle protection coverage for their vehicle."[6] In particular, Defendants advertise that CarShield Vehicle Service Contracts provide consumers with coverage equivalent to a manufacturer's warranty.[7]

6.      Defendants advertise a "crystal clear" and timely claims process where customers can use their chosen repair facility.[8]

7.      Defendants further publicize that CarShield coverage allows consumers to obtain automobile repairs at no cost. Specifically, CarShield states that "with a service contract from CarShield, your covered repair claims *will be paid 100% by your administrator.*"[9]

8.      When consumers, including Plaintiffs, file claims for repairs under their CarShield Vehicle Service Contract, however, Defendants do not deliver on their contractual obligations. Defendants take several weeks or months to render decisions on claims and have denied repair coverage in violation of the contract.

9.      As a result, consumers, including Plaintiffs, have incurred out-of-pocket expenses while waiting for Carshield to render decisions on their claims, lost the use of their vehicles while waiting for a decision on their claims, have been forced to pay out of pocket for repairs that Defendants agreed to cover, and otherwise paid for a Vehicle Service Contract that does not provide the promised coverage.

---

[5] https://shieldrepairnetwork.com/carshield-srn-about-us (last visited March 21, 2025)
[6] https://carshield.com/why-carshield/ (last visited March 21, 2025)
[7] https://carshield.com/coverage (last visited March 21, 2025)
[8] https://carshield.com/customer-commitment.php (last visited March 21, 2025)
[9] https://carshield.com/how-it-works/vehicle-owner-benefits/#:~:text=With%20a%20service%20contract%20from,not%20covered%20by%20your%20contract. (last visited March 21, 2025) (emphasis added)

10.     After entering into Vehicle Service Contracts, Defendants have forced consumers to pay monthly premiums on plans that do not provide the promised and expected coverage.

11.     Accordingly, Plaintiffs, on behalf of themselves and all other consumers who purchased Vehicle Service Contracts from Defendants, bring this action for breach of contract, fraudulent concealment, common law fraud, negligent misrepresentation, unjust enrichment, and for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. § 505/1 *et. seq.*, and the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. Ann. § 75-1.1 *et seq.*

## PARTIES

**Plaintiff April Lindsey-Evans**

12.     Plaintiff April Lindsey-Evans ("Plaintiff" for purposes of this section) is a citizen and resident of North Carolina.

13.     On June 3, 2020, Plaintiff purchased a Vehicle Service Contract from United (which was later acquired by American Auto Shield, LLC) through its vendor CarShield for her 2010 Volkswagen Tiguan vehicle, which bears Vehicle Identification No. WVGBV7AX3AW536501.

14.     Under the Vehicle Service Contract, Plaintiff was required to pay $89.99 per month to maintain her coverage and paid it at all times relevant to her allegations.

15.     Plaintiff purchased a Vehicle Service Contract with Defendants based on their advertisements and representations to Plaintiff that her vehicle would be covered in the event it needed repairs.

4

16.     In early March 2024, Plaintiff's Tiguan would not start. She contacted Defendants to file a claim for coverage. Defendants instructed her to have her vehicle towed to a mechanic, so Plaintiff had her vehicle towed to Eurobahn VW.

17.     Defendants informed Plaintiff that they only needed a diagnostic report and list of necessary repairs in order to approve her claim.

18.     On or around March 18, 2024, Eurobahn VW performed diagnostics and identified a list of necessary repairs. Plaintiff and Eurobahn VW sent the diagnostic report and list of necessary repairs to Defendants to supplement Plaintiff's claim.

19.     From March 18, 2024 to mid-April 2024, Plaintiff and Eurobahn VW maintained constant communication with Defendants to provide Defendants with all requested documentation and information needed for Defendants to approve Plaintiff's claim for coverage. For example, Defendants asked for photos of the vehicle, which Plaintiff provided the same day they were requested. Then, Defendants requested a bill of sale for the vehicle, which Plaintiff provided. After receiving confirmation that Defendants had everything they needed to approve her claim, Defendants informed Plaintiff they did not have the documentation they previously acknowledged as received.

20.     Several weeks later, in approximately May 2024, Defendants informed Plaintiff that Eurobahn VW was required to dissemble the engine at Plaintiff's cost before deciding whether any of the necessary repairs would be covered. A Eurobahn VW mechanic informed Defendants that a full disassembly was unnecessary and that the vehicle was properly diagnosed without disassembly. In lieu of disassembly, on or around May 15, 2024, Eurobahn VW used a scope camera in the engine to take photos of the internal components of the engine to provide Defendants with further evidence supporting Eurobahn VW's initial diagnosis and necessity for the repairs.

21.    On or around May 20, 2024, Defendants informed Plaintiff that they would only partially cover her claim for coverage. Defendants informed Plaintiff that it would not cover Eurobahn VW's labor rate, despite their contractual obligation to cover her mechanic's posted labor rate.

22.    As shown below, Plaintiff's Vehicle Service Contact does not limit coverage for labor, and explicitly promises to pay the repair facility's labor rate:

- **MARKET LABOR RATE:**   ADMINISTRATOR will authorize repairs for covered MECHANICAL BREAKDOWN OR FAILURE based upon the REPAIR FACILITY'S posted labor rate.   The maximum payable repair facility labor rate of One Hundred Dollars ($100.00) per hour shall not apply.

23.    As a result, Plaintiff was forced to pay nearly $3,000 to repair her vehicle.

24.    During the two months Defendants took to render a decision on her claim, Plaintiff incurred out-of-pocket expenses of approximately $800.00 for alternative transportation.

25.    Further, Plaintiff was forced to pay her monthly premium for CarShield coverage during the pendency of her claim.

26.    Due to Defendants' advertisements and representations, Plaintiff expected that her claim would be approved and that the repairs would be covered under the Vehicle Service Contract.

27.    Plaintiff reasonably relied on Defendants' representations regarding coverage when purchasing a Vehicle Service Contract.

28.    Had Plaintiff known that coverage would be denied, Plaintiff would not have purchased a Vehicle Service Contract, or would have paid substantially less for it.

29.    Plaintiff notified Defendants of these alleged violations by letter dated February 21, 2025.

**Plaintiffs Brenna Sebek and Kevin Sheehan**

30.    Plaintiffs Brenna Sebek and Kevin Sheehan ("Plaintiffs" for purposes of this section) are citizens and residents of Illinois.

31.    On February 27, 2024, Plaintiffs purchased a Vehicle Service Contract from American Auto Shield through its vendor CarShield for a vehicle owned by Plaintiff Sheehan.

32.    Plaintiff Sheehan owns a 2016 Volkswagen Jetta vehicle, bearing Vehicle Identification No.: 3VWD67AJ9GM295202.

33.    Under the Vehicle Service Contract, Plaintiffs were required to pay $169.99 per month to maintain their coverage and paid it at all times relevant to their allegations.

34.    Plaintiffs purchased the Vehicle Service Contract based on Defendants' advertisements and representations that the vehicle would be covered in the event it needed repairs.

35.    On or around May 2, 2024, Plaintiffs brought their vehicle to Martins Auto Electric for an engine problem. That day, Plaintiffs filed a claim for coverage with Defendants.

36.    From May 2, 2024 to July 19, 2024, Plaintiffs and Martins Auto Electric maintained constant communication with Defendants to provide Defendants with all requested documentation and information needed for Defendants to approve Plaintiffs' claim for coverage. For example, Defendants requested service records, records of oil changes, photos of the vehicle, and quotes from Martins Auto Electric, which Plaintiffs promptly provided. Additionally, Defendants required a teardown of the vehicle.

37.    Defendants informed Plaintiffs that they would be required to bear the costs of a required teardown, despite Defendants' contractual obligations to cover the costs of teardown.

38.     As shown below, Plaintiffs' Vehicle Service Contact explicitly states that Defendants are responsible for the costs of any teardown requested by Defendants:

5. **TEARDOWN:** WE may require a TEARDOWN to determine the primary cause of the BREAKDOWN and if it is a COVERED BREAKDOWN. If WE require a TEARDOWN, it will be at OUR expense. YOU will be required to give TEARDOWN authorization to the REPAIR FACILITY before any TEARDOWN is performed.

39.     Defendants forced Plaintiffs Sebek and Sheehan to bear the costs of the teardown.

40.     On July 19, 2024, Defendants informed Plaintiffs that they had denied the claim for coverage. When Plaintiffs requested more information about the contractual basis for denial, Defendants provided inconsistent answers, including stating that "nothing is wrong with the vehicle," despite the mechanic's diagnosis report and quote for necessary repairs.

41.     As a result, Plaintiffs were forced to pay nearly $3,500 for the teardown and necessary repairs.

42.     During the two and a half months Defendants took to render a decision on their claim, Plaintiffs incurred out-of-pocket expenses of approximately $1,500.00 for alternative transportation.

43.     Further, Plaintiffs were forced to pay their monthly premium for CarShield coverage during the pendency of their claim.

44.     Due to Defendants' advertisements and representations, Plaintiffs expected that claims would be approved and that the costs for teardowns and repairs would be covered under the Vehicle Service Contract.

45.     Plaintiffs reasonably relied on Defendants' representations regarding coverage when purchasing a Vehicle Service Contract.

46.    Had Plaintiffs known that coverage would be denied, Plaintiffs would not have purchased a Vehicle Service Contract, or would have paid substantially less for it.

47.    Plaintiffs notified Defendants of these alleged violations by letter dated February 21, 2025.

**Defendants**

48.    Defendant NRRM, LLC d/b/a/ Carshield, LLC "markets vehicle service contracts administered by American Auto Shield."[10] CarShield is registered as a fictious name and CarShield.com is a registered trademark of NRRM. NRRM is registered as a Missouri corporation located at 339 Mid Rivers Mall Drive, St. Peters, Missouri 63376.

49.    Defendant American Auto Shield, LLC, is "the industry's leading administrator [and] payment processor."[11] American Auto Shield is registered as a Wyoming corporation located at 14033 Denver West Parkway, Suite 200, Lakewood, Colorado 80401. Upon information and belief, United Service Protection, In merged with American Auto Shield, LLC, and American Auto Shield, LLC acquired United's assets and liabilities, United no longer exists as a separate corporate entity.

50.    DOEs 1-100 are persons or entities of unknown places of residence or states of incorporation that perpetrated the wrongdoing alleged herein. Plaintiffs reserve the ability to seek leave to amend to name DOEs 1-100 as Defendants based on discovery served on Defendants and third parties with whom Defendants interacted.

51.    American Auto Shield, LLC, Carshield, and the DOE Defendants were principals, agents, alter egos, joint venturers, partners, or affiliates of each other, and in doing the acts alleged

---

[10] https://carshield.com (last visited March 21, 2025)
[11] https://carshield.com/why-carshield/our-partners/ (last visited March 21, 2025)

herein, were acting within the course and scope of that principal, agent, alter ego, joint venture, partnership, or affiliate relationship.

## JURISDICTION AND VENUE

52.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

53.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants transact business in this district, are subject to personal jurisdiction in this district, and therefore are deemed to be citizens of this district. Additionally, a substantial part of the events or omissions giving rise to the claim occurred in this district, Defendants have advertised in this district, and Defendants have received substantial revenue and profits from its sales of Vehicle Service Contracts in this district.

54.     This Court has personal jurisdiction over Defendants because they have conducted substantial business in this judicial district, and intentionally and purposefully sold Vehicle Service Contracts within the state of Missouri and throughout the United States. Defendant CarShield also maintains its corporate headquarters in this district.

## FACTUAL ALLEGATIONS

**Vehicle Service Contracts**

55.    A Vehicle Service Contract is distinct from a manufacturer's warranty. "A manufacturer's warranty is included in the price of a new vehicle."[12] A Vehicle Service Contract, however, is purchased separately from a vehicle between the consumer and Defendants.

56.    Further, a manufacturer's warranty "often covers your vehicle for a certain number of months or miles, whichever comes first."[13] A Vehicle Service Contract, on the other hand, often provides coverage beyond the manufacturer's warranty, either by adding additional months or miles to a vehicle's coverage or by promising to cover more or different repairs.

57.    CarShield markets Vehicle Service Contracts developed and administered by American Auto Shield.

58.    To make a claim under any CarShield Vehicle Service Contract, a consumer must request a Service Manager or Certified Technician at a repair shop to contact American Auto Shield, the claims administrator, and receive approval for the repair before any work is performed.[14]

59.    If the claim falls within a Vehicle Service Contract's coverage, American Auto Shield agrees to cover the claim in full. If a claim does not fall within the Contract's coverage (e.g., routine maintenance items, such as oil changes), American Auto Shield denies the claim.

60.    The cost of a covered claim is then paid directly to the repair facility by American Auto Shield, and any cost not covered must be paid out of pocket by the consumer.[15]

**Defendants' False, Deceptive, and Misleading Advertising**

---

[12] https://consumer.ftc.gov/articles/auto-warranties-and-auto-service-contracts (last visited March 21, 2025)

[13] https://consumer.ftc.gov/articles/auto-warranties-and-auto-service-contracts (last visited March 21, 2025)

[14] https://carshield.com/help-support/claims/ (last visited March 21, 2025)

[15] *Id.*

61.     The CarShield website states that their mission "is to free our customers from the anxiety of unforeseen breakdowns and costly repairs."[16]

62.     CarShield advertisements often feature high-profile celebrity endorsers. For example, CarShield.com features an endorsement from Ice-T, an actor, musician, and author, stating:  "Nobody likes it when their check engine light comes on, especially when your car is out of warranty. That can mean expensive repair bills. That's why I have CarShield."[17] Specifically, CarShield states that "with a service contract from CarShield, your covered repair claims ***will be paid 100% by your administrator.***"[18]

63.     Defendants further tout themselves as America's "#1 Auto Protection Company."[19] Defendants promise to offer customers "the single most comprehensive vehicle protection coverage for their vehicle."[20]

64.     Defendants represent to consumers that "a CarShield service contract is designed to pick up where your existing warranty drops off, or to fill any gaps in coverage."[21] In particular, Defendants advertise that CarShield Vehicle Service Contracts provide consumers with "bumper to bumper" or "full vehicle" coverage, equivalent to a manufacturer's warranty.

65.     Defendants further state that "[t]his gives you the peace of mind that you've got continuous protection against costly auto repairs."[22]

---

[16] https://carshield.com (last visited March 21, 2025)
[17] *Id.*
[18] https://carshield.com/how-it-works/vehicle-owner-benefits/#:~:text=With%20a%20service%20contract%20from,not%20covered%20by%20your%20contract. (last visited March 21, 2025) (emphasis added)
[19] https://shieldrepairnetwork.com/carshield-srn-about-us (last visited March 21, 2025)
[20] https://carshield.com/why-carshield/ (last visited March 21, 2025)
[21] https://carshield.com/education-center/vehicle-protection-101/ (last visited March 21, 2025)
[22] https://carshield.com/education-center/vehicle-protection-101/ (last visited March 21, 2025)

66.    Defendants advertise that they have a "crystal clear" and timely claims process where customers use their chosen repair facility.[23] In fact, Defendants promote their repair network with thousands of repair facilities that accept Carshield.

67.    Even if a consumer regularly services his own car, Defendants state that he should purchase a CarShield Vehicle Service Contract because "[a]s vehicle technology becomes increasingly complex, it becomes more challenging—and potentially problematic—for even the most experienced do-it-yourselfers to fix their own vehicles. Even seemingly simple repairs now require computerized diagnostics, specially trained technicians, and sophisticated equipment only found in specialized repair facilities."[24]

68.    Defendants commit: "We hold up our end of the bargain."[25]

**Defendants' Pattern of Delaying and Denying Claims**

69.    Despite promises of a swift and straightforward claims process, Defendants consistently employ delay tactics to avoid fulfilling their contractual obligations. Rather than facilitating "crystal clear" claim resolutions, Defendants' methods create significant barriers for consumers attempting to secure coverage under their contracts.

70.    Consumers report being subjected to frustrating and redundant procedures. Instead of proactively communicating what is needed to process claims, Defendants force consumers to repeatedly reach out for updates. Each time consumers call, they are met with new customer service agents who provide conflicting information, often stating that all necessary documentation has been received, only to later request additional materials such as photographs, vehicle

---

[23] https://carshield.com/customer-commitment.php (last visited March 21, 2025)
[24] *Id.*
[25] https://carshield.com (last visited March 21, 2025)

maintenance records, or other documents. This cycle repeats, unnecessarily delaying the claims process.

71.     Further, Defendants often require repair shops to perform superfluous labor after diagnosing the problem and recommending repairs. Not only are these demands excessive, but Defendants also refuse to compensate the repair shops for this additional work. These tactics effectively delay the decision-making process, and force consumers to pay these costs out of their own pockets.

72.     Even after consumers comply with all demands and submit the required documentation, Defendants routinely deny legitimate claims without sufficient explanation. Denials are issued without referencing specific contract terms, leaving consumers with substantial repair bills, out-of-pocket expenses from the delay in claims processing, out-of-pocket monthly premiums for their contract, and lost use of their vehicles. These practices not only contradict the Defendants' assurances but also cause significant financial harm to consumers.

73.     Defendants' delay tactics minimize payouts rather than delivering on the advertised protection.

**Defendants Violate Their Contracts With Consumers**

74.     In addition to the above violations, Defendants blatantly disregard several provisions within their contracts.

**A. Pre-Existing Conditions**

75.     When consumers file claims for coverage, they are frequently informed that their claims are denied due to a supposed pre-existing condition. Defendants define pre-existing conditions as "BREAKDOWNS that occurred prior to the CONTRACT purchase date or during

the WAITING PERIOD." However, these alleged pre-existing conditions are conspicuously absent from any prior documentation, such as vehicle service records or maintenance history.

76.     As described herein, Defendants are in the business of selling Vehicle Service Contracts for older vehicles with high mileage. Defendants do not perform vehicle inspections before Defendants sell Vehicle Service Contracts to consumers. Indeed, all that Defendants require from consumers at the time of sale is an attestation of the vehicle's make, model, year, and mileage, which consumers provide as a condition of obtaining a Vehicle Service Contract. Upon information and belief, Defendants could perform a vehicle inspection prior to selling Vehicle Service Contracts, but choose not to do so. By not conducting an inspection, it allows Defendants to later use a supposed pre-existing condition as a pretextual reason to deny an otherwise valid claim, while also retaining all of the installment payments.

77.     Thus, Defendants deny claims based on undocumented and unverifiable pre-existing conditions, which violate the terms of the Vehicle Service Contracts.

78.     As a result, consumers are forced to incur out-of-pocket costs to repair their vehicles.

### B. Labor Rates

79.     When consumers file claims for coverage, Defendants refuse to cover the full cost of parts and/or labor. Defendants claim to use "nationally recognized parts and labor time guides" to determine the reasonable costs of labor and parts but fail to disclose the source or the specific labor rates used, even after consumers report requested them from Defendants.

80.     Defendants' practice of using various labor rate guides is problematic for important reasons. First, the labor guides used by Defendants are not publicly available. Indeed, one must sign up for a paid subscription in order to access the data contained within the labor guides. Thus,

consumers are deprived of the opportunity to review the terms of the labor guide before or after sale of their Vehicle Service Contracts.

81.     Second, Defendants advertise that consumers may choose their repair facility, but subsequently limit their liability by refusing to pay the labor rates charged by those facilities. When consumers request the labor guide allegedly used to justify these denials, Defendants consistently withhold this information.

82.     Third, Defendants' contracts often explicitly cover the mechanic's full labor rate without restrictions. Despite such clear contractual language, Defendants still refuse to pay the mechanic's labor rate.

83.     Defendants' systematic underpayment of labor rates, refusal to disclose the labor guide, and failure to inform consumers of these limitations constitute material breaches of contract. Moreover, Defendants only inform consumers of their refusal to pay the repair facilities' labor rates after repair facilities already performed the work. Thus, consumers are deprived of the ability to either decline a repair, take their vehicle elsewhere, or attempt to fix their vehicle themselves.

84.     As a result, consumers are left with no choice but to cover the repair costs out of pocket in order to retrieve their vehicles from the repair facility.

**C. Teardown Fees**

85.     Defendants sell contracts to consumers that cover the costs of teardown.

86.     Despite clear contractual language obligating Defendants to cover the costs of teardowns, Defendants refuse to cover these costs and force consumers to pay them as a condition of reviewing their claims.

87.     As a result, consumers are forced to incur out-of-pocket expenses related to teardown fees.

**Consumer Experiences**

88.    The internet is replete with consumer complaints, including complaints on prominent consumer websites, including the Better Business Bureau and Consumer Affairs. Below is just a mere smattering of the tens of thousands of complaints online:[26]

a.   On July 25, 2025, a consumer wrote: "So my issue with CarShield is that, when you call to get a contract and you give them money monthly! They're extremely polite like a cult and lure you in, but how they treat you when it's time to fix your vehicle is horrible. They need all these documents and it doesn't add up to what the contract states and what was initially said when you are giving them information at first! They will try everything in their power to deny your claim. You are a company to provide care, maintenance and coverage to fix vehicles so do it! Especially when you're getting paid on time. Another huge annoyance is that they request you to give them 12 months of maintenance receipts, like who keeps that. They will not get another dime out of me unless it's a ghost giving it to them! I'm not going back and forth with them any longer. I have consulted with a law firm and will contact FOX 5 for exposure!! Period!!"[27]

b.   On July 19, 2024, a consumer wrote: "The WORST investment made with Car Shield, and always trying to DENY CLAIMS you've encounter. Sales team are customer oriented but the Warranty is TERRIBLE. Purchasing Warranty was easily made through Sales Team and their Department gave General Information in basics coverage and they're able to address payment system from your Banking institution or Credit Card. They're cordial and wouldn't call them professional as they "relay unsatisfactory remarks" about other competitive companies that offer Vehicle Warranties."[28]

c.   On July 2, 2024, a consumer wrote: "I wish I could give this company negative stars. BEWARE. Do not purchase Carshield, they will find any and all reasons to deny a claim. And if you are to get them to cover a repair, you will have to fight and fight and fight. Save yourself the stress and money and go with any other company."[29]

---

[26] The following complaints are reproduced as they appear online. Any typographical errors are attributable to the original author.

[27] https://www.consumeraffairs.com/auto_warranty/carshield.html?page=1#sort=recent (last visited March 21, 2025)

[28] *See id.*

[29] *See id.*

d.  On June 25, 2024, a consumer wrote: "I purchased an Auto Warranty from Carshield in February of ************************************************************ April 2024 I began experiencing issues with the vehicle I called the company and made a report they came and towed my vehicle from my home and took it to a dealership, they verified my coverage is valid to pay the claim as soon as they found out the amount to repair the vehicle they started making excuses on why they dont want to pay, the dealership is in the process of taking adverse action to take my vehicle due to nonpayment, I have sent everything needed for processing the claim but they continue to refuse service my vehicle will be sold by the dealership and I will without a vehicle, I have kids and havent been able to get around for over 60 days, If they didnt want to fix my vehicle they shouldnt have set the appointment up with the dealership and picked it up, what we have is a breach of contract."[30]

e.  On June 14, 2024, a consumer wrote: "They have had our truck for over two months in a shop and we have been fighting back-and-forth whether they were going to approve a new transmission to be put into it and then they told us two weeks ago that it was approved that It would be there within 15 days and here we are not being told that we wouldnt get the transmission into the shop until the end of the month and yet they will not help us cover any more days on a rental saying its only 14 days that theyre not technically supposed to approve a rental until been approved for the transmission to be replaced, but they gave it to us two weeks before the transmission was approved to be replaced and now were stuck eating the cost of a rental. Theyre not willing to help work with us anyway. We are also paying them 130 a month and havent had to use them until April and we are going over two months without our vehicle. Its our only means of transportation and we have been put into a difficult position. And no way of getting to and from work and doctors appointments now."[31]

f.  On April 15, 2024, a consumer wrote: "On April 15th I called CarSheild letting them know I was bringing my car to a local PepBoys to get the A/C diagnosed on my car. PepBoys said " we won't deal with CarSheild because they are too difficult and want to use cheap parts". CarSheild's biggest advertisement is, you can take your car to any mechanic of your choice and as long as what your trying to fix is part of your coverage they will handle it. Because PepBoys refused to work with ********* that's false advertising on CarSheilds part. Since 8/8/2023 I've paid $117.28 a month, Thats $938.24 for the 8 months I've

---

[30] https://www.bbb.org/us/mo/saint-peters/profile/auto-service-contract-companies/carshield-0734-310030296/complaints?page=5 (last visited March 21, 2025)

[31] https://www.bbb.org/us/mo/saint-peters/profile/auto-service-contract-companies/carshield-0734-310030296/complaints?page=7 (last visited March 21, 2025)

had CarSheild. It's been a waist of money and a waist of my time. The biggest joke is. PepBoys roughly estimated about $500 in just parts for the A/C on my car. ********* said I could pay out of pocket, give them the invoice and they would " review " the invoice and determine what they would cover. The representative even said I might not get a full refund. My warenty contract even states it covers air-conditioning. I found CarSheild from their advertisement on T.V stating you can take ur car to any mechanic of your choice. That's the main reason why I chose CarSheild because I have a modified car and some shops don't have the right equipment for my car or my car is too low for their lifts. So I have to go to shops of my choice. I feel vary inconvenienced about their false advertising. I work outside all day. I can't even enjoy air-conditioning in my car because of the inconvenience of CarSheild's false advertising. I should be reimbursed the 8 months I've had a contract with them so I can drop them and fined a better, more reliable warenty. And of course they charge a $75 cancelation fee. This was the first attempt to ever use my warranty and nothing came out of it because of CarSheild's false advertising and huge inconvenience."[32]

g.   On April 12, 2024, a consumer wrote: "My claim was denied for dirt in my engine and its not right. Im a single parent dont have extra money and now out of a car. I will file a claim against this company because its not right how they take individuals money knowing they will never approve there claims."[33]

h.   On April 9, 2024, a consumer wrote: "On January 2, 2024, Complainant brought his 2014 Dodge vehicle to ********* in *********, ** regarding his transmission. ********* contacted ******** Auto Shield (AAS) to initiate a claim under the warranty, sending photos of fluid. There was no response by AAS. Three days later, ********* resent photos to AAS. An inspector was sent to site. The inspector did see that there was pink/red (not burnt) transmission fluid in the transmission, however the adjuster did not drop the transmission pan and did not test drive the vehicle. The adjuster determined that there was fluid leaking on the coolant line to the transmission and thus said the fluid was low" and denied the claim. Rather than perform a careful inspection of the transmission acknowledging that the car has approximately ******* miles, ******************** denied the claim. Letters were sent by counsel for Complainant to AAS regarding the denial of the claim, to no avail. Complainant's policy with AAS requires resolution by BBB. We filed an arbitration with ****************************** and AAS requested

---

[32] https://www.bbb.org/us/mo/saint-peters/profile/auto-service-contract-companies/carshield-0734-310030296/complaints (last visited March 21, 2025)
[33] *See id.*

that it be dismissed because it should be resolved by BBB. *** has a history of denying claims for transmissions."[34]

i. On April 8, 2024, a consumer wrote: "Oct 2023 my truck would not stay running. Car shield was called and they towed it to Dodge Dealership ****************** in Am *********. Claim # ******* was finally issued after many months. Pictures were taken and sent in 5 times at least . Maintenance records submitted all while they are taking premiums out every month. My truck has sat there 7 months and is repaired but they refuse to pay them because they said no authorization number was given. Why a dealer would repair without a number and only verbal authorization is not my problem. This is between them. I need my truck or a rental now. I will send you the last text from car shield stating again they need pictures, then the next day, they said they have the pics only to contradict themselves the next day saying they need the pics. Again they are asleep at the wheel while fraudulently taking my money. Is this a Moral Hazard and who is responsible for due diligence? They keep trying to **** this off on ******************. I dont understand the relationship. Was on the phone with them and dealer for 3 hours trying to resolve. They said a manager would call me that next friday (3/29/24), but ***** called. I have told them in my last phone call not to take another nickle out of my account until this is paid. If they cancel my policy it's because of fraudulent circumstances on thier part, not mine. How are they getting away with this? 6 months they have held my truck hostage while taking my money. Please investigate this business. And tell *********************** she is not helping matters. Many black Americans are going to get screwed over because they trust her. She should do her due diligence before using her reputation to peddle these pirates."[35]

j. On April 6, 2024, a consumer wrote: "Contract # MRF-******* Claim # ******* Frustrated and angry does NOT even come close to describe the way this whole experience with this supposedly reputable company made me feel. I say supposedly reputable company because it seems they go to a lot of expense to put out ads/commercials that even star well known celebrities. But, when it comes time to work with the actual customer that pays their monthly fees, the company doesnt seem to want to be bothered to follow thru on the terms of the contract. Or, for that matter, anything that was told to the customer over the phone by their claims representatives and/or supervisors. I was lied to repeatedly by the Car Shield claims reps. I was told someone would review the claim again and look at the correct video showing the vehicle problem with the water pump. But, that was not the case, because everyone kept referring to the

---

[34] *See id.*
[35] *See id.*

first INCORRECT picture even though myself and the employee from the repair shop very clearly told the Car Shield rep that the picture was not to be used for the claim, but instead the video showing the broken water pump pouring water out (I know because I heard the conversation on speaker phone). I again was lied to when told multiple times that an investigator would go to the repair shop and look at my car. BUT, NO ONE EVER WENT TO THE REPAIR SHOP TO LOOK AT MY CAR! Why bother to tell a customer what you intend to do if you have NO INTENTION AT ALL OF FOLLOWING THRU?I want a resolution to this situation immediately. This has been going on for a month as I originally reported the problem to Car Shield on 03/07/2024. I even told the Car Shield rep in that initial phone call that I believed the problem was the water pump. I have been jerked around for weeks without my car AND without a rental car since they denied the claim. I want someone to do their **** job at Car Shield or I intend to make VERY PUBLIC my extreme dissatisfaction for this company on every forum I can find."[36]

k. On April 4, 2024, a consumer wrote: "Please be advised that unlike other insurances that actually covers vehicles for break downs, Car shield is nothing but a big scam. Buyers Beware! I have been a gold member for four year, and guess what, I never filed any claims. As I was driving my car last week, the Serpentine belt broke from the engine due to two damaged pulleys, which was covered under the policy. To my surprise, when the mechanic contacted Car shield, It failed to honor the contract and denied my claim. Again, Car shield is a scam. To better protect your car, please shop elsewhere."[37]

l. On April 3, 2024, a consumer wrote: "Had coverage, motor had internal failure with no warning lights, or check engine light on and still not on at dealership. Carshield denied my claim for replacement even after dealership mechanic stated the while motor failed to warn any issue and computer had no history of a issue even though the motor started knocking. Dealership stated not consumers fault and could not be detected or prevented with current state of vehicle 2020 kia ***** ****** miles on vehicle."[38]

m. On April 2, 2024, a consumer wrote: "I file a complain about Car shield! We were formed after we contacted with our car mechanic that the car shield covered our 300$ shifting cable issues on our ***** cruise 2013 model!!Than my wife called the car shield and the claims was denied and after the agent broke up the phone with a finished nasty cover with my wife! This company

---

[36] *See id.*

[37] *See id.*

[38] https://www.bbb.org/us/mo/saint-peters/profile/auto-service-contract-companies/carshield-0734-310030296/complaints?page=2 (last visited March 21, 2025)

should out of business because the false advertising and unethical business practices!!"[39]

n.  On April 2, 2024, a consumer wrote: "Had vehicle diagnostic ran for flickering light after car sat for 2 year from grandmas passing invoice only shows flickering light after diagnostic no issues found with vehicle other than that which was 8/11/23 fast forward to February 2024 car was having power issues took to shop they said something was wrong with engine filed a claim with CarShield which they have denied due to the diagnostics that was done to the vehicle in August of 2023 said the flickering lights are cause for denial"[40]

o.  On March 29, 2024, a consumer wrote: "In January I purchased the warranty for coverage on my car I specifically ask if this warranty be accepted at all Chevrolet dealerships for my car, and I was told that it would be, but today while trying to file a claim, I was told by more than 3 Chevrolet dealerships that I have went to that they do not accept car shield at all!!!! Today when I called to speak to a representative at car shield about the misleading information that I was provided when I first got the policy she informed me that it may have been A sales tactic used to get me to sign up for a warranty with them! When I informed her that I would like a full refund because I was told information that was not accurate. She informed me that there are no refunds and that if I wanted to refund, I should have called within 30 days of my policy starting because that is the only timeframe to obtain a refund, and I informed her that I wouldve never signed up from day one if I wouldve knew that car shield was not accepted at all dealerships like I was lied & told and number two I informed her that at that time when I first got the policy there were no problems going on with my car so how was I to even know that Car she was not accepted at a Chevrolet dealership in order for me to even cancel within the 30 days!!! The representative then told me that she would be able to get my payments down to from $128.99 a month to $89 a month and I ask her why would you drop down the payments every month by $40? If this wasnt a scam that doesnt even make sense. I have continued to make payments to this *********** has been nothing but dishonesty from the beginning and a scam! & according to the customer ********************* representative today, a sales tactic !"[41]

p.  On March 27, 2024, a consumer wrote: "CarShield has mispresented its warranty. They tell consumers that you can take you care to any car repair shop or one of their authorized car repair shops. I live in ***********, ** and CarShield has the local ******** **** Service center as an approved repair

---

[39] *See id.*

[40] *See id.*

[41] *See id.*

shop, however when I took my vehicle there they informed me that they do not honor Carshield warranties because of prior bad dealings with getting approvals on recommended repairs that suppose to be covered repairs. I cannot find a repair shop in ********** who will accept a CarShield warranty. The contract sold to me is a fraud and gross misrepresentation of the warranty. I paid monthly payments keeping the contract in good standing and the very first time I needed a repair on a covered part the ******** benz in my city doesn't accept CarShield warranties. CarShield listed the local ******** benz service center as an approved repair shop knowing or should have known they no longer honored their warranty. I am requesting a full refund."[42]

q.  On March 26, 2024, a consumer wrote: "If given the opportunity, I would rate this company with zero stars! This establishment is an absolute scam! In January 2024, I purchased insurance for my son's vehicle as a precautionary measure. Unfortunately, on March 2, 2024, the timing chain malfunctioned, resulting in the car being towed by our comprehensive coverage insurance provider, USAA, to our trusted family mechanic. I HAVE ATTACHED PROOF OF MY CONTACT WITH THE CLAIMS ADJUSTER AND MY EMAIL BEING BLOCKED. I HAVE NEVER HAD ANY INTERACTION WITH CHARLES **. THAT WAS MY FIRST AND ONLY ATTEMPT TO CONTACT HIM, AS ADVISED BY MY MECHANIC. To cut a long story short, despite numerous phone calls, transfers, escalations, and emails, no one bothered to return my calls. Eventually, my claim was denied by the company, citing an "expired registration" on their part, which is completely untrue. I provided evidence that the car had been continuously covered from March 2023 to March 2024, along with the receipt for the new year's registration coverage from March 2024 to March 2025. The purpose of this review is to inform you that this company is engaged in fraudulent activities. They offer no assistance, fail to address your concerns, and when you request to speak with a supervisor, there are none available. While they are prompt in deducting monthly payments for their deceitful policy, they will deny legitimate claims based on false reasons such as "no registration." It is important to note that in New Jersey, vehicle registration is valid for one year. For further assistance regarding this matter, I recommend reaching out to Ted ** and Jason **."[43]

r.  On March 11, 2024, a consumer wrote: "TERRIBLE PLACE AND WASTE OF 6 MONTH OF MY LIFE WITHOUT CAR!!! HAD CONTRACT ** SINCE OCTOBER 2023. MY ISSUE CASE ID ** when shop discovered issue with supercharger. It is pricy part and Carshield decided that I have to pay for

---

[42] *See id.*

[43] https://www.consumeraffairs.com/auto_warranty/carshield.html?page=1#sort=top_reviews&filter=1 (last visited March 21, 2025)

it. Totally false advertising. I had golden coverage since beginning, had NO ISSUE with engine in October and have proof with 103K miles from oil change and service record in Oct. Used Carshield since october and now in February after they see problem with supercharger they say - I had it before. Totally scam!!!! Paid 1500+$. Now need to PAY 7000+$ for supercharger. I have no money and no car now!!! They will cheat you in all the steps and tell you that issue was before you started coverage. Most awful company. Do not recommend to anyone. I am without my car 6 months because their adjusters can't approve anything and switch you from 1 shop to another and you have to pay for everything. Attorney."[44]

s.   On March 6, 2024, a consumer wrote: "I bought CarShield because they called… I bought CarShield because they called me when I was searching up the best warranty company. CarShield is garbage. When I purchased my car, I ended up having a catalytic converter problem. However, I knew CarShield would not cover the catalytic converter which I had no problem with. I replaced the catalytic converter at a reputable repair shop that deals with CarShield. Right after I picked up the car I drove it for 81 miles. The check engine light came back on and it said low, boost turbo. Which the turbo is covered under CarShield's service plan. Unfortunately, CarShield denied the repairs to the car. Said they were pre-existing conditions. I supplied them all the documentation proving to them that it was not pre-existing. So they escalated the claim. The new claim representative denied it again. This time it was because of the Cadillac catalytic converter, which has nothing to do with the claim the auto shop was repairing. They were repairing an exhaust leak around the exhaust manifold. I went to cancel my service because I knew of the issues CarShield. They would not issue a refund, nor would they let me talk to somebody else. They said this is absolute and that's it, worst customer service ever. I would never recommend CarShield."[45]

t.   On March 5, 2024, a consumer wrote: "Purchased Car Shield in 2023, had for 6 months, needed my car repaired for a misfire. I took my car to a reputable car dealership to have the repairs completed. The dealership notified Car Shield that my car was there to be repaired, Car Shield told them that my account was not active. So, once I verified that my account was active I had already recived my car back un repaired. I spent months calling all of the repair shops on the Car Shield repair app and no one was able to repair my car. I wasted months of payments on a warranty that I was not able to utilized. Car Shield was not able to assist me in finding a repair shop out of the repair shops that they dealt with. I would not suggest this warranty to anyone. The trouble and headaches that I

---

[44] *See id.*
[45] *See id.*

endured I just gave up because no one was willing to help me. Unhappy Customer"[46]

u.   On March 1, 2024, a consumer wrote: "Customer service is absolutely lacking. Transferred 6 times in 1.5 hours, to be ridiculed about a page 9 contract excerpt. I've been a customer for 4 years, with one minimal claim in the tenure. An emergency repair was necessary for my vehicle, while working in a remote GA town. Claim was basically denied, as the shop owner would not work directly with Carshield. As I was miles from any other shop, qualified to perform repairs on a BMW, Carsheild deemed the repairs as 'not in contract'. In their response, they offered $250 for 'emergency repair', of the $3000.00 I paid to get my car back on the road. As well, they had just debited $173.00 for the monthly coverage...which is NOT REFUNDABLE on the same day it was debited, no after. Needless to say, I CANCELLED my contract, and they can keep the $ 8000 I've paid in the past 4 years...I guess as a parting gift! NEVER in my life have I encountered worse customer service...even being told that they 'couldn't handle my request, and guarantee a call back on their own', after having been on the phone for over an hour. I stayed on the line, just to be accused of lying about a call I had with their company, before repairs were made to my BMW. This is the FIRST review I have ever written, for any company, as this is not in my typical wheelhouse...Though thought it necessary, to assist others in making a better decision about car 'health' coverage. Also, there is a Class Action Suit against their company...check it out...Stay vigilant my friends!"[47]

v.   On February 15, 2024, a consumer wrote: "Upon recommendation I signed up with Carshield. Paid them for about 8 months. My car broke down. Towed it to a repair facility that does the service. The vehicle broke down january 10th. It was there until feb 14th. When I called them to find out what is taking so long they wanted my registration for every week. It was something or the other with them. The customer svc hung the phone up on me when I asked why it took them this long to ask me for my registration. Very rude. I PAID THEM A TOTAL OF $1120 FOR NOTHING. BIG TIME SCAM. WOULD NOT RECOMMEND THIS COMPANY EVER. RIP OFF."[48]

w.   On Febraury 14, 2024, a consumer wrote; "So I found fluid marks in my driveway under my vehicle. I was glad that I had CarShield coverage to address the issue. That is until... I brought the vehicle first to my trusted

---

[46]https://www.consumeraffairs.com/auto_warranty/carshield.html?page=2#sort=top_reviews&filter=1 (last visited March 21, 2025)

[47] *See id.*

[48] *See id.*

ASE certified mechanic, then to the dealer (Dodge) where I purchased it and the both literally laughed at me when I asked if they accepted Carshield. I called CarShield and they recommended PepBoys. So... I take my vehicle there and explain the situation. A mechanic there does a diagnostic check and come up with seepage in the two problem areas. CarShield denied my claim stating that seepage is not covered. Yet tech found and noted "LEAKAGE" from the oil filter housing and steering cooler assembly. They try to use semantics to avoid paying out on a claim. DO NOT GET THEIR LACK OF COVERAGE."[49]

x. On January 18, 2024, a consumer wrote; "Opinion: In most cases having a policy with CarShield would be throwing money away, and it would be difficult for me to be more disappointed with them. Experience: When I signed up for the policy, I was told that it could be used at any dealership, however after taking my car into a dealership for repairs the dealer said they didn't work with CarShield. After speaking with two people at CarShield to see what dealerships are in the area, there were a very small number - and none for my car's brand. They worked with about 3 or 4 dealerships in the area in total compared to the area having dozens! It would not make sense to pay dealer repair rates at another brand's dealership to have someone work on the car who isn't trained on it and isn't using factory parts, to which they agreed. I had been paying for the plan for over 2 years before looking to make a claim and the customer service supervisor at CarShield refused to refund me anything because my plan was month to month instead of their term length contract. Lesson: Find a mechanic you like and ask if they have any warranty providers that they work with. Don't do it the other way around as it is much harder to find a trusted mechanic than a warranty provider."[50]

y. On January 7, 2024, a consumer wrote: "I had a warranty with CarShield back in 2021. When a problem happened with my car the warranty department would not honor the warranty. They told me that they needed the service record on the vehicle to determine if the vehicle had already been serviced for that issue. I was never told that I would undergo this kind of scrutiny prior to establishing the account with Car Shield. The moral to the story is they did not warrant the warranty. To anyone that decides to get and extended warranty with Car Shield I advised to make sure they give you a full disclosure on what they are willing to honor the warranty on. what they did to me was crazy. Instead of honoring the warranty and fixing my car, they gave me the money back that I paid them for four months. Oh,

---

[49] *See id.*
[50] *See id.*

the reality was that my car needed a repair that far exceeded the cost that I paid into the warranty.. Shame on you Car Shield..."[51]

z.  On December 13, 2023, a consumer wrote: "My suggestion is "save your money". This outfit takes your money but they don't always pay for covered repairs. I bought a policy that I thought was through Car Shield but they flipped it to Auto Shield a subsidiary company of theirs. The rear diff went out on my truck. They sent out an adjuster who claimed the damage was from a collision. The repair shop said there was no sign of collision. I bought the truck new and it had never been in any type of an accident. I paid premiums every month for nothing"[52]

aa.  In 2023, a consumer wrote: "My brother had it and could not get most car repair shops to even take it. They told him that car shield wouldn't reimburse them properly. He wasn't happy with it."[53]

bb.  In 2023, a consumer wrote: "My husband works in an auto shop and told me they're absolutely horrible to deal with and cover almost nothing. If anyone is considering using them, don't."[54]

cc.  In 2023, a consumer wrote: "Its a joke, They make your mechanic diagnose the problem of why it broke first, then they review why it broke, and tell you that you are not covered for the rubber seal that went bad and drained your transmission fluid so we are not buying you a new transmission. Look it up under BBB complaints. actually look at the dumb *** commercials, if that doesn't say it all, you probably deserve to throw money away. My neighbor got it about 3 months ago and was proud to tell me about it."[55]

**The FTC Fined Defendants $10 Million for Engaging in Deceptive Advertising**

89.  On July 31, 2024, the Federal Trade Commission ("FTC") filed a complaint against Defendants and alleged that the Defendants' advertising and marketing of their Vehicle Service Contracts were deceptive and misleading.[56] Specifically, the FTC alleged that Defendants falsely

---

[51] *See id.*

[52] *See id.*

[53] https://www.reddit.com/r/CommercialsIHate/comments/130ud5v/has_anyone_you_know_ever_actually_signed_up_for/ (last visited March 21, 2025)

[54] *See id.*

[55] *See id.*

[56] *See* https://www.ftc.gov/news-events/news/press-releases/2024/07/carshield-nationwide-seller-vehicle-service-contracts-pay-10-million-resolve-federal-trade (last visited August 2, 2024);

promised consumers with "peace of mind" and "protection" from the cost and inconvenience of vehicle breakdowns, yet refused to provide coverage, refused to provide consumers with rental vehicles, and refused to allow consumers to use the repair facility of their choice.[57]

90.     In addition, the FTC alleged "while CarShield's celebrity endorsers said they had signed up and used the company's VSCs, in many cases this was not true."[58]

91.     Defendants settled with the FTC for $10 million.[59]

92.     Upon information and belief, despite the FTC settlement, Defendants continue to engage in deceptive and misleading advertising and other violations of their contracts as described herein.

## CLASS ALLEGATIONS

93.     Plaintiffs bring this action, individually, and on behalf of the below classes, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3), defined as follows:

**Nationwide Class:**
All persons in the United States who purchased a Vehicle Service Contract from CarShield.

**Illinois Sub-Class:**
All persons in Illinois who purchased a Vehicle Service Contract from CarShield.

**North Carolina Sub-Class:**
All persons in North Carolina who purchased a Vehicle Service Contract from CarShield.

---

https://www.ftc.gov/system/files/ftc_gov/pdf/NRRM-dba-Carshield-Complaint.pdf (last visited March 21, 2025)

[57] https://www.ftc.gov/news-events/news/press-releases/2024/07/carshield-nationwide-seller-vehicle-service-contracts-pay-10-million-resolve-federal-trade (last visited March 21, 2025)

[58] *Id.*

[59] *Id.*

Collectively, unless otherwise indicated, the class(es) are referred to herein as the "Class." Excluded from the Class(es) are: (a) Defendants; (b) Defendants' affiliates, agents, employees, officers and directors; and (c) the judge assigned to this matter, the judge's staff, and any member of the judge's immediate family. Plaintiffs reserve the right to modify, change, or expand the various class definitions set forth above based on discovery and further investigation.

94.     **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. While the exact number and identity of individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that the Class consists of over two million consumers.[60] The number and identity of Class members can be determined based on Defendants' records.

95.     **Commonality**: Common questions of law and fact exist as to all members of each Class. These questions predominate over questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

    a.   Whether Defendants engaged in the conduct alleged herein;

    b.   Whether Defendants breached their contracts with Plaintiffs and the Class;

    c.   Whether Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act;

    d.   Whether Defendants violated Missouri's Merchandising Practices Act;

    e.   Whether Defendants violated Missouri's Vehicle Extended Service Contract Law;

---

[60] https://carshield.com/why-carshield/our-company/#:~:text=CarShield%20administrators%20get%20your%20vehicle,protecting%20over%20two%20million%20vehicles (last visited March 21, 2025)

      f.   Whether Defendants violated the North Carolina Unfair and Deceptive Trade Practice Act;

      g.   Whether Defendants have been unjustly enriched by Plaintiffs and the Class; and

      h.   Whether class members are entitled to injunctive relief, actual and/or statutory damages for the aforementioned violations, and, if so, in what amount.

96.   **Typicality**: Plaintiffs have the same interest in this matter as all Class members, and Plaintiffs' claims arise out of the same set of facts and conduct as the claims of all Class members. Plaintiffs and Class members' claims all arise out of Defendants' uniform conduct and statements.

97.   **Adequacy**: Plaintiffs have no interest that conflicts with the interests of the Class, and is committed to pursuing this action vigorously. Plaintiffs have retained counsel competent and experienced in complex consumer class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the Class.

98.   **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class member is relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of this case. Individualized rulings and judgments could result in inconsistent relief for similarly situated individuals. By

contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION
### COUNT I
### BREACH OF CONTRACT
**(On Behalf of the Nationwide and State Classes)**

99. Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

100. Plaintiffs and the Class members entered into a contract with Defendants when they purchased Vehicle Service Contracts.

101. The contract required that Defendants timely process claims for coverage and approve claims for covered repairs.

102. Defendants' obligations under the contract were intended to benefit Plaintiffs and the Class members.

103. Plaintiffs and the Class members reasonably relied on Defendants' ability to perform according to its obligations when they purchased Vehicle Service Contracts.

104. Defendants' obligations were material to Plaintiffs' and the Class members' decisions to purchase Vehicle Service Contracts because a reasonable person would have considered them to be important in deciding whether to enter into such agreements.

105. Plaintiffs and the Class members paid monthly premiums to Defendants in order to obtain the coverage guaranteed under the contract.

106. Defendants breached its contracts with Plaintiffs and the Class when they failed to timely process claims and/or cover repairs under the Vehicle Service Contract by denying claims.

107.     Defendants' breach of the contract directly injured Plaintiffs and the Class members, who were forced to pay out of pocket for necessary repairs that they expected, and were promised, would be covered under CarShield Vehicle Service Contracts.

108.     Plaintiffs and the Class members paid monthly premiums and complied with all other obligations under the contract but did not receive the promised benefits in return.

109.     As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have been injured and sustained damages.

110.     Plaintiffs notified Defendants of these alleged violations by letters dated July 2, 2024 and February 21, 2025.

## COUNT II
## UNJUST ENRICHMENT
### (On Behalf of the Nationwide and State Classes)

111.     Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

112.     This claim is brought in the alternative to Plaintiffs' contract-based claims.

113.     Plaintiffs and the Class members paid monies to Defendants.

114.     Defendants knowingly and willingly accepted and appreciated these benefits.

115.     Defendants' retention of these benefits would be inequitable because Defendants obtained benefits to the detriment of Plaintiffs and the Class members.

116.     As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have been injured and sustained damages.

117.     Plaintiffs notified Defendants of these alleged violations by letters dated July 2, 2024 and February 21, 2025.

## COUNT III
## FRAUDULENT CONCEALMENT

**(On Behalf of the Nationwide and State Classes)**

118.     Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

119.     Defendants made material misrepresentations and omissions concerning a presently existing or past fact in violation of the common law. Defendants did not fully and truthfully disclose to customers the true nature of the coverage under the Vehicle Service Contracts or the timeliness upon which Defendants would render decisions pursuant to the Vehicle Service Contracts. A reasonable consumer could not have discovered these material facts prior to purchasing a Vehicle Service Contract.

120.     Defendants made these material misrepresentations and omissions with knowledge of their falsity and with the intent that Plaintiffs and Class members rely upon them.

121.     The facts concealed, suppressed, and not disclosed by Defendants to Plaintiffs and Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase a Vehicle Service Contract.

122.     Defendants had a duty to disclose the true facts about the Vehicle Service Contracts and the process by which coverage is determined under them because the knowledge of the Vehicle Service Contracts and their details were known and/or accessible only to Defendants; Defendants had superior knowledge and access to the relevant facts; and Defendants knew the facts were not known to, or reasonably discoverable by, Plaintiffs and Class members. Defendants also had a duty to disclose because it made many affirmative representations about the Vehicle Service Contracts, including references as to coverage, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual terms of the Vehicle Service Contracts.

123.     Had Plaintiffs and the Class known about the true nature of the Vehicle Service Contracts, they would not have purchased a Vehicle Service Contract or would have paid less in doing so. Thus, Plaintiffs and the other Class members were fraudulently induced to purchase Vehicle Service Contracts.

124.     Plaintiffs and Class members reasonably relied on Defendants' material misrepresentations and omissions and suffered damages as a result. Defendants' conduct was willful, wanton, oppressive, reprehensible, and malicious. Consequently, Plaintiffs and Class members are entitled to an award of punitive damages.

125.     Plaintiffs notified Defendants of these alleged violations by letters dated July 2, 2024 and February 21, 2025.

**COUNT IV**
**COMMON LAW FRAUD**
**(On Behalf of the Nationwide and State Classes)**

126.     Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

127.     Defendants advertised, marketed, and sold Vehicle Service Contracts.

128.     Defendants marketed that their Vehicle Service Contracts provided bumper-to-bumper coverage and peace of mind and protection from repair bills.

129.     Defendants sold Vehicle Service Contracts with the knowledge that Defendants would not provide said coverage.

130.     Defendants intended that Plaintiffs and the Class members rely on these material misrepresentations and omissions when purchasing Vehicle Service Contracts.

131.     Defendants induced Plaintiffs and the Class members to purchase Vehicle Service Contracts with knowledge that they would not provide coverage thereunder.

132.    The facts misrepresented, concealed, and omitted by Defendants were material to Plaintiffs' and the Class members' decisions to purchase Vehicle Service Contracts because a reasonable person would have considered them to be important in deciding whether to enter into such agreements.

133.    Defendants knew or should have known that the facts misrepresented, concealed, and omitted were material to Plaintiffs and the Class members.

134.    Defendants had a duty to inform Plaintiffs and the Class members that it would not offer coverage because Defendants had superior knowledge of the coverage, and Plaintiffs and the Class members could not have reasonably been expected to discover the extent of the coverage through reasonable diligence before purchasing Vehicle Service Contracts.

135.    Plaintiffs and the Class members reasonably relied on Defendants' ability to perform according to their obligations when they purchased Vehicle Service Contracts.

136.    Defendants' misrepresentations and omissions directly injured Plaintiffs and the Class members, who were forced to pay out of pocket for necessary repairs that they expected, and were promised, would be covered under CarShield Vehicle Service Contracts, as well as were forced to incur out of pocket expenses associated with Defendants' undue delay in rendering decisions on claims for coverage.

137.    Plaintiffs and the Class members paid monthly premiums and provided Defendants with other benefits, but did not receive the promised benefits in return.

138.    Had Plaintiffs and the Class members known of the facts misrepresented, concealed, and omitted by Defendants, they would not have purchased Vehicle Service Contracts, or would have paid substantially less for them.

139.    Plaintiffs notified Defendants of these alleged violations by letters dated July 2, 2024 and February 21, 2025.

## COUNT V
## NEGLIGENT MISREPRESENTATION
### (On Behalf of the Nationwide and State Classes)

140.    Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

141.    Plaintiffs bring this cause of action on behalf of themselves and the Class against all Defendants.

142.    Defendants had or undertook a duty to disclose the Vehicle Service Contract truthfully and accurately.

143.    Defendants had a duty to exercise reasonable care in making representations and/or statements concerning the Vehicle Service Contracts and the process by which coverage thereunder is decided.

144.    Defendants breached their duty and failed to exercise reasonable care when they misrepresented the true nature of the process and coverage under the Vehicle Service Contracts. Specifically, Defendants misrepresented and failed to disclose to Plaintiffs and the Class that they would not timely process claims for coverage under the Vehicle Service Contracts and that the Vehicle Service Contracts did not cover repairs, despite Defendants' statements to the contrary.

145.    Defendants knew or should have known that their statements and/or omissions alleged herein were materially false and/or misleading.

146.    Defendants' misrepresentations were material in that Plaintiffs and the Class believed the misrepresentations to be important in making their decision to purchase Vehicle Service Contracts.

147.    Defendants knew or should have known that their misrepresentations would induce Plaintiffs and the Class to purchase a Vehicle Service Contract from Defendants and pay premiums under the Contract.

148.    But for Defendants' misrepresentations, Plaintiffs and the Class would not have purchased Vehicle Service Contracts from Defendants or would have paid substantially less to do so.

149.    Plaintiffs and the Class reasonably relied on Defendants' misrepresentations and, as a direct and proximate result of Defendants' conduct, Plaintiffs and the Class suffered damages.

150.    Plaintiffs notified Defendants of these alleged violations by letters dated July 2, 2024 and February 21, 2025.

## COUNT VI
## PROMISSORY ESTOPPEL
### (On Behalf of the Nationwide and State Classes )

151.    Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

152.    Defendants promised to provide coverage pursuant to Vehicle Service Contracts.

153.    Plaintiffs and the Class reasonably relied upon Defendants' promises to their detriment when they purchased their Vehicle Service Contracts.

154.    Plaintiffs and the Class demand that Defendants honor their contractual obligations with them.

155.    Plaintiffs notified Defendants of these alleged violations by letters dated July 2, 2024 and February 21, 2025.

## COUNT VII
## VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT
### 815 Ill. Comp. Stat. § 505/1 *et seq.* ("ICFA")

**(On Behalf of the Illinois Sub-Class)**

156.    Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

157.    Plaintiffs Sebek and Sheehan bring this claim individually and on behalf of the Illinois Sub-Class.

158.    Plaintiffs Sebek and Sheehan and Illinois Sub-Class members are "consumers" within the meaning of 815 Ill. Comp. Stat. § 505/1(e).

159.    Plaintiffs Sebek and Sheehan, Illinois Sub-Class members, and Defendants are "persons" within the meaning of 815 Ill. Comp. Stat. § 505/1(c).

160.    Defendants engage in "trade" or "commerce" within the meaning of 815 Ill. Comp. Stat. § 505/1(f).

161.    Defendants engage in the "sale" of "merchandise" as those terms are defined by 815 Ill. Comp. Stat. § 505/1(b) and (d).

162.    The ICFA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce." 815 Ill. Comp. Stat. § 505/2.

163.    Defendants' acts and practices, described herein, are unfair and deceptive in violation of Illinois law. By selling Vehicle Service Contracts with exclusive or superior knowledge about the true nature of the contracts' coverage, and by failing to disclose the true nature of coverage or honor claims for coverage in good faith, Defendants acted unscrupulously in a manner that is substantially oppressive and injurious to consumers. Defendants owed a duty

to disclose all material facts concerning the Vehicle Service Contracts because they possessed exclusive or superior knowledge, intentionally concealed material information from consumers, and/or made misrepresentations that were rendered misleading because they were contradicted by facts that were withheld.

164.    Defendants committed these unfair and deceptive acts and practices with the intent that consumers, such as Plaintiffs Sebek and Sheehan and Illinois Sub-Class members, would rely upon Defendants' misrepresentations and omissions when deciding whether to purchase a Vehicle Service Contract.

165.    Plaintiffs Sebek and Sheehan and Illinois Sub-Class members suffered ascertainable loss as a direct and proximate result of Defendants' unfair and deceptive acts and practices. Had Plaintiffs Sebek and Sheehan and Illinois Sub-Class members known that Defendants would delay and deny coverage under the Vehicle Service Contracts, they would not have purchased a Vehicle Service Contract, or would have paid significantly less for one. Among other injuries, Plaintiffs Sebek and Sheehan and Illinois Sub-Class members overpaid for their Vehicle Service Contracts and their Vehicle Service Contracts suffered a diminution in value.

166.    Accordingly, pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiffs Sebek and Sheehan and the Illinois Sub-Class seek actual compensatory, and punitive damages (pursuant to 815 Ill. Comp. Stat. § 505/10a(c)), injunctive relief, and reasonable attorneys' fees and costs.

167.    Plaintiffs notified Defendants of these alleged violations by letter dated February 21, 2025.

**COUNT VIII**
**VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT ("NC UDTPA")**
**(N.C. Gen. Stat. Ann. § 75-1.1 *et seq.*)**
**(On Behalf of the North Carolina Sub-Class)**

168.    Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint.

169.    Under North Carolina's Unfair and Deceptive Trade Practices Act ("NC UDTPA"), "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."  N.C. G. S. § 75-1.1(a).

170.    Under the NC UDTPA, "commerce" is defined as "all business activities, however denominated, but does not include professional services rendered by a member of a learned profession."  Id. at § 75-1.1(b).

171.    Under the NC UDTPA, any person or business injured "by reason of any act or thing done by any other person, firm, or corporation in violation of the provisions of this Chapter" shall "have a right of action on account of such injury done[.]"  Id. at § 75-16.

172.    Defendants' conduct constituted an "unfair or deceptive act[] or practice[]" because Defendants made available for sale Vehicle Service Contracts that they knew, or should have known, would not provide the promised coverage. Specifically, Defendants represented that their Vehicle Service Contracts would provide comprehensive coverage and that claims would be timely approved. However, Defendants failed to meet their contractual obligations because they refuse to honor their contractual obligations, such as approving covered claims and/or approving them in a timely fashion. Defendants should have known they had made available for sale Vehicle Service Contracts that fail to provide the promised coverage because of the numerous complaints by consumers reporting that Defendants do not honor their contracts. Despite knowing they had made the Vehicle Service Contracts available for sale, Defendants did not inform Plaintiffs, the public, or other vendors of the true nature of coverage thereunder.

173.     Defendants' actions constitute "commerce" under the NC UDTPA because they sold Vehicle Service Contracts to Plaintiffs and the Class that do not provide the promised coverage.   Therefore, Defendants were involved directly and indirectly in the sale of assets, including tangible goods and things of value.

174.     Plaintiffs Lindsey-Evans suffered harm due to Defendants' unfair and deceptive acts.   Plaintiff Lindsey-Evans was forced to pay out-of-pocket for the mechanic's labor rate, despite her contract stating that Defendants would pay the mechanic's labor rate. Additionally, Plaintiff Lindsey-Evans was forced to continue paying her monthly premium on the Vehicle Service Contract during the months Defendants failed to render a timely decision regarding coverage.

175.     Even though Defendants were aware that the Vehicle Service Contracts would not provide the coverage they advertised and promised to consumers and Plantiffs, they did not disclose these facts to Plaintiff Lindsey-Evans and the North Carolina Sub-Class. Had she known of the true nature of coverage under the Vehicle Service Contract, Plaintiff Lindsey-Evans would not have purchased her Vehicle Service Contract or would have paid substantially less for it.

176.     Plaintiff Lindsey-Evans, therefore, seeks all remedies available to her for Defendants' breach of the NC UDTPA.

177.     Plaintiffs notified Defendants of these alleged violations by letter dated February 21, 2025.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that this Court:

A.  Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.  Appoint Plaintiffs as representatives of the Class and their counsel as Class Counsel;

C.  Award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and the Class members are entitled;

D.  Award pre-judgment and post-judgment interest on such monetary relief;

E.  Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to adhere to the terms of the Vehicle Service Contracts and to provide Plaintiffs and the Class members with appropriate curative notice regarding Defendants' change in business practices, and to correct their advertising and marketing practices as described herein;

F.  Award reasonable attorneys' fees and costs; and

G.  Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.

Dated: March 21, 2025

Respectfully submitted,

*/s/ Domenica M. Russo*
Domenica M. Russo – Mo. Bar # 74819
Brandon M. Wise – Mo. Bar #67242
**PEIFFER WOLF CARR KANE CONWAY & WISE**
One U.S. Bank Plaza, Suite 1950
St. Louis, MO 63101

Telephone: 314-833-4827
Email: drusso@peifferwolf.com
Email: bwise@peifferwolf.com

Joseph G. Sauder
Matthew D. Schelkopf
Joseph B. Kenney
Juliette T. Mogenson
**SAUDER SCHELKOPF LLC**
1109 Lancaster Avenue
Berwyn, PA 19312
Tel: (888) 711-9975
Facsimile: (610) 421-1326
jgs@sstriallawyers.com
mds@sstriallawyers.com
jbk@sstriallawyers.com
jtm@sstriallawyers.com

*Attorneys for Plaintiffs*